UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MULTI-COLOR CORPORATION,

        Plaintiff,

    v.

RYAN CUNY and INOVAR PACKAGING
GROUP, LLC,

        Defendants.

No. 25 CV 3948

Judge Georgia N. Alexakis

**MEMORANDUM OPINION AND ORDER**

Defendant Ryan Cuny worked as a sales account manager at plaintiff Multi-Color Corporation ("MCC") before leaving for a new employer, Inovar Packaging Group, LLC, a competitor in the "premium labeling solutions" industry. MCC sued Cuny for breach of contract, Inovar for tortious interference with contracts, and both defendants for tortious interference with business relationships and violating Illinois and federal trade secrets laws, initially in state court. [1-1]. Cuny and Inovar removed to federal court, [1], and now move to dismiss, [6]. For the reasons given below, that motion is granted.

## I.    Legal Standards

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must allege facts sufficient "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A court must accept the complaint's factual allegations as true and draw all reasonable inferences in the plaintiff's favor (as the Court does in the section that follows), but a court need not

accept legal conclusions or "threadbare recitals" supported by "conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## II. Background

MCC is "a global leader in the manufacture and development of premium labeling solutions" that "partners with customers in a wide variety of industries, including automotive, beverages including wine and spirits, durables and technical, food and dairy, healthcare, home care and laundry, and personal care and beauty." [1-11] ¶¶ 7–8. Cuny was initially hired as an account manager in 2012 by Fort Dearborn Company ("FDC") but became an MCC employee after a 2021 corporate merger. *Id.* ¶ 10. FDC did not have a dedicated spirits division, but Cuny was "part of the team for a major national bourbon maker, and eventually the main salesperson on that account and then additional Spirits accounts" within the national beverages team. *Id.*

Cuny kept this role after the merger, which involved "playing an integral role in driving growth within the North American region as a part of a global commercial team, leading account strategy, building key customer relationships, managing a pipeline of new opportunities, leading various cross-functional teams including marketing, operations, technical and supply chain, developing customer bids and RFPs, negotiating contracts, and developing strategic account plan[s]." *Id.* ¶ 11. Cuny was entrusted with "a wide variety of confidential and trade secret information" and "was in an exclusive group of employees provided access to this information." *Id.* ¶¶ 12, 16.

When Cuny joined FDC in 2012, he signed an employment agreement ("the Agreement") containing confidentiality, non-competition, and non-solicitation clauses. *Id.* ¶¶ 12–14. These provisions read, in full, as follows:

> Confidential Information: The parties herein recognize that by reason of their involvement with each other, Employee may acquire confidential information and trade secrets concerning the operation of FDC or its affiliates or subsidiaries, the use or disclosure of which could cause FDC or its affiliates or subsidiaries substantial loss and damages which could not be readily calculated and for which no remedy at law would be adequate. Accordingly, Employee covenants and agrees that he will not at any time, directly or indirectly, use or disclose any secret or confidential information that he may learn or have learned by reason of their association. The term "Confidential Information" includes, without limitation, information not previously disclosed to the public or to the trade by FDC with respect to FDC or any of its affiliates or subsidiaries respective products, facilities, applications and methods, data formulae, programs, trade secrets and other intellectual property, systems, procedures, manuals, documentation, confidential reports, product price lists, customer lists, technical information, financial information (including the revenues, costs or profits associated with any of FDC's products), business plans, prospects or opportunities but shall exclude any information already in the public domain.

*Id.* ¶ 12; *see also id.* at 27–28 ¶ 1.

> Non-competition. During Employee's employment by FDC or any successor and for twelve (12) months following termination there of Employee shall not, directly or indirectly, for or on behalf of himself or any company or firm in which Employee may be working or employed:
>
> > (a)     (i) Call upon, solicit, divert, take away, or provide services competitive with the Business ("Competitive Services"), (ii) attempt to solicit, divert, take away, or provide Competitive Services to Employee Contacts, or (iii) accept any business from Employee Contacts for Competitive Services (even if such Employee Contacts contact Employee first). As used in this paragraph, "Employee Contacts" means any customers or potential customers of FDC that Employee called upon, served, made a proposal to provide services to, sold to, or received any information about in preparation for making a proposal to provide services to, during employment by FDC, whether or not Employee

previously served those Employee Contacts prior to becoming an employee of FDC.

*Id.* ¶ 13; *id.* at 28 ¶ 3(a).

> <u>Non-solicitation</u>. During Employee's employment by FDC or any successor and for twelve (12) months following termination there of Employee shall not, directly or indirectly, for or on behalf of himself or any company or firm in which Employee may be working or employed...
>
> (b)    Solicit any employee of FDC to leave FDC or agree to hire any such employee or a former employee of FDC (unless at least six months has passed since termination of such other employee's employment with FDC.

*Id.* at 28 ¶ 3(b); *see also id.* ¶ 14.

Cuny resigned from MCC on February 18, 2025. *Id.* ¶ 19. MCC believes that he had already accepted a job offer with Inovar—which MCC describes as "a direct competitor"—though Cuny did not disclose his destination when he submitted his resignation. *Id.* ¶¶ 19–20, 21. MCC further alleges that while "Inovar has historically focused on labels for makers of craft spirits rather than the large spirit producers who are major customers in the labeling industry," MCC subsequently "received information that Inovar hired Cuny to launch a comprehensive spirits division" and that by hiring Cuny, "Inovar is poised to make this pivot based upon the customer relationships Cuny has cultivated and built at MCC, and upon MCC's proprietary and trade secret information." *Id.* ¶ 24.

MCC sued Cuny and Inovar on March 14, 2025, in Illinois state court, [1-1], and then filed a first amended complaint two weeks later, [1-11]. In that operative complaint, MCC brought seven state-law and two federal-law counts against Cuny, Inovar, or both. Cuny and Inovar then removed the matter to federal court. [1]. Once

4

in federal court, MCC moved for a preliminary injunction, [23], which the Court denied following expedited discovery and an evidentiary hearing, [39], [62], [64], [65]. The Court now turns its attention to defendants' motion to dismiss.

## III.   Analysis

### A.   Application of the Agreement

The parties first dispute whether the Agreement applies to his current position at Inovar. The point of contention is whether the term "Business"—defined by the Agreement to include "the food and beverage … industries"—encompasses Cuny's role in Inovar's wine and spirits division. [1-11] at 27; [7] at 2–3; [30] at 3–4. Cuny and Inovar argue that "wine and spirits" are a separate segment of the labeling market from "beverages" and therefore are not contemplated by the Agreement, [7] at 5, while MCC argues that wine and spirits are included in the term "beverage," [30] at 3–4.

The Agreement provides that it will be governed by Illinois law. [11-1] at 29 ¶ 5(g). In construing a contract under Illinois law, "the primary objective is to give effect to the intention of the parties." *Right Field Rooftops, LLC v. Chi. Cubs Baseball Club*, LLC, 870 F.3d 682, 689–90 (7th Cir. 2017). "A court must initially look to the language of a contract alone, as the language, given its plain and ordinary meaning, is the best indication of the parties' intent." *Id.* at 690 (cleaned up).

5

In its plain and ordinary meaning, the word "beverage" encompasses whiskey and wine.[1] Nothing in the Agreement itself indicates the parties intended to depart from this ordinary meaning. Even if the Court were to consider extrinsic evidence, the record supports MCC's contention that the Agreement was intended to encompass work involving spirits. For example, the operative complaint alleges that Cuny was put on "the team for a major national bourbon maker" when he began at FDC and that because FDC did not have a distinct wine or spirits division that "spirit sales were more broadly a part of its national 'beverages' team." [1-11] ¶ 10. Indeed, nothing in the record indicates Cuny ever worked on an account for FDC that was not a spirits manufacturer. [65] at 8–9.

The Court thus concludes that the Agreement applies to Cuny's work in the wine and spirits market.

## B.      Cuny's Alleged Breach of Contract (Counts I and II)

Counts I and II involve claims against Cuny for breach of contract. "In order to establish a claim for breach of contract [under Illinois law], a plaintiff must allege and prove the following elements: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff. *Burkhart v. Wolf Motors of Naperville, Inc. ex rel. Toyota of Naperville*, 2016 IL App (2d) 151053, ¶ 14 (cleaned up). MCC alleges that

---

[1] *See liquor,* Oxford English Dictionary Online, https://www.oed.com/dictionary/liquor_n (defining "spiritous liquor" as a "beverage") (last visited Oct. 30, 2025); *wine*, Oxford English Dictionary Online, https://www.oed.com/dictionary/wine_n1 (defining wine as "[t]he fermented juice of the grape used as a beverage") (last visited Oct. 30, 2025).

6

Cuny has breached the Agreement's confidentiality, non-competition, and non-solicitation clauses. The Court proceeds through each clause in turn.

### 1. Confidentiality

MCC concedes that it "has not yet specifically identified particular confidential information Cuny has taken." [30] at 10.[2] But MCC argues that the "Cuny *will* breach these provisions by working for Inovar, and by stealing, retaining, utilizing, and/or inevitably disclosing MCC's Confidential Information." [1-11] ¶ 30 (emphasis added). Cuny and Inovar argue that the confidentiality agreement is overbroad and unenforceable, in particular because it contains no temporal or geographic restrictions. [7] at 7–9.

Even assuming the confidentiality clause is valid, MCC has not sufficiently alleged any actual breach or "resultant injury," both necessary elements of the breach of contract claim. *Burkhart*, 2016 IL App (2d) 151053, ¶ 14. As discussed previously, there is no allegation that Cuny has actually disclosed any confidential information to Inovar. Instead, MCC's theory is that Cuny will inevitably disclose such information in his work. [30] at 10 (citing *Westrock Co. & Victory Packaging, LP v. Dillon*, 21-CV-05388, 2021 WL 6064038 (N.D. Ill. Dec. 22, 2021)). But the inevitability of a disclosure is not so evident. Yes, Cuny accepted a similar position at Inovar, but "[t]he fact that a former employee accepted a similar position with a competitor,

---

[2] MCC goes on to qualify that concession by saying that it "has not taken any discovery," *id.*, although that statement predates the expedited discovery the parties conducted before the preliminary injunction hearing, which included both written discovery and depositions [39], and the hearing itself. Since then, MCC has not sought leave to amend its complaint to, among other things, bring up to date any factual allegations.

without more, will not demonstrate inevitable disclosure." *Stenstrom Petroleum Services Group, Inc. v. Mesch*, 375 Ill. App. 3d 1077, 1096 (2d Dist. 2007) (involving trade secret misappropriation claim); *see also Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1070 (N.D. Ill. 2020) ("[P]laintiffs must allege more than 'the mere fact that a person assumed a similar position at a competitor' to state a claim for inevitable disclosure, which requires 'a showing of intent or a high probability' that the employee will use trade secrets.") (citing *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995), and *Saban v. Caremark Rx, L.L.C.,* 780 F. Supp. 2d 700, 734 (N.D. Ill.2011). "Courts are 'cautious' in their application of the doctrine due to its significant potential to curb employee movement among competitors." *See Packaging Corp.*, 419 F. Supp. 3d at 1070 (citing *Triumph Packaging Group v. Ward*, 834 F. Supp. 2d 796, 809 (N.D. Ill. 2011)).

MCC asserts that "the [operative complaint] makes clear that Cuny is steeped in MCC's Confidential Information (such as pricing information and details about the strategy and history of his two largest clients) and that Cuny cannot perform his job at Inovar without using that information." [30] at 10 (citing [1-11] ¶¶ 16–17, 23–24, 30). Indeed, the complaint alleges that "[i]t would be *impossible* for [Cuny] to work in a competitive capacity with Inovar without necessarily using and disclosing MCC's trade secret information." [1-11] ¶ 25 (emphasis added). Still, the Court is not obligated to accept this allegation as true, where MCC "has alleged nothing with respect to the actions [Inovar] has or has not taken to prevent trade secret disclosure" and has provided "no foundation upon which the Court might find a showing of intent

8

or high probability that [Cuny] will use its trade secrets." *See Packaging Corp.*, 419 F. Supp. 3d at 1070; *see also id.* (concluding that without such factual allegations, plaintiff had insufficiently pled the inevitability doctrine based solely on the fact that the two companies at issue "are direct competitors" and that the individual plaintiff's "new and former positions … both involve sales of the same type of product").

Instead, the complaint acknowledges that MCC and Inovar, at the time of Cuny's departure, focused on different types of customers within the spirits industry. [1-11] ¶ 24 (alleging that "Inovar has historically focused on labels for makers of craft spirits rather than the large spirit producers who are major customers in the labeling industry"). It is therefore not so apparent that confidential information Cuny acquired while at MCC would be transferable to Inovar's existing customer base. *Contra Strata Mktg., Inc. v. Murphy*, 317 Ill. App. 3d 1054, 1071 (2000) (plaintiff sufficiently alleged inevitable disclosure where the new employer "directly competes with [plaintiff's] products" and therefore the former employee "could not help but employ … her knowledge of the pricing structure of [plaintiff's] products, her knowledge of particular customer needs, her knowledge of customer identified problems with [plaintiff's] software, her knowledge of planned product upgrades and enhancements, and her knowledge of existing customer contracts").

And with respect to MCC's stated concern that Cuny will use its confidential information to help Inovar "make [a] pivot" to the type of customers traditionally served by MCC, in *Packaging Corporation*, the plaintiff had at least alleged that its former employee had begun to solicit restricted customers after switching jobs.

9

*Packaging Corp.*, 419 F. Supp. 3d at 1070. Here, there is no allegation that Cuny has solicited MCC clients while at Inovar, so the Court cannot infer (even assuming it would be reasonable to do so), that a violation of the non-solicitation clause would inevitably lead to a violation of the confidentiality provision. Ultimately, the relevant threshold is plausibility, not possibility. *See Twombly*, 550 U.S. at 557 (dismissing complaint where allegations fell "short of the line between possibility and plausibility of entitlement to relief"). And based on the allegations in its first amended complaint, MCC's theory of inevitable disclosure falls short, where it merely asserts that inevitable disclosure will occur without sufficient additional and corroborative allegations.[3]

MCC's allegations compare particularly unfavorably with the only case upon which MCC relies to oppose dismissal of its breach of contract claims, *Westrock*. [30] at 10. In *Westrock*, the complaint alleged that defendant Thomas Dillon "emailed to

---

[3] To be sure, plaintiffs in other cases "have succeeded in stating claims for inevitable disclosure" by alleging that "the defendant 'could not operate or function' in the new position without relying on the trade secrets." *See Packaging Corp.*, 419 F. Supp. 3d at 1070 (pointing to exemplars). In *PepsiCo*, however, defendants "concede[d] that [the former employee] might be faced with a decision that could be influenced by certain confidential information that he obtained while at [the former employer]." 54 F.3d at 1270. In *Allied Waste Servs. of N. Am., LLC v. Tibble*, 177 F. Supp. 3d 1103, 1112 (N.D. Ill. 2016), the former employee emailed the plaintiff's "confidential information to his personal email address shortly before his employment ended." These additional factors could very well tip the scales from possible to plausible. And in *General Electric Company v. Uptake Technologies, Inc.*, 394 F. Supp. 3d 815, 833 (N.D. Ill. 2019), plaintiff supported its inevitable disclosure claim with allegations that the former employees "scheduled meetings outside the scope of their duties to acquire GE confidential information before they resigned"; "accessed a series of documents that, while dated for GE, would provide a tremendous advantage to Uptake"; "maintained significant GE files on a cloud-based repository after he resigned"; "possessed photographs of GE whiteboards that contained trade secrets and confidential information after they left GE"; "provided GE employee compensation information to Uptake so that it could lure away GE employees"; and "rendered their GE devices unreadable before they returned them in order to hide their misappropriations."

himself numerous files with addresses and phone numbers for hundreds of WestRock's moving company customers both inside and outside Dillon's sales territory"; "forwarded to his email customer pricing information"; as well as other information like customer "delivery receipts, invoices and price lists" and sales strategy materials. 2021 WL 6064038, at *8–13. While it is true "that an employer rarely has direct evidence of an employee's improper use and disclosure at the outset of misappropriation litigation," *id.* at *24, the complaint that passed muster in *Westrock* "allege[d] that Dillon still has the information at issue; outlines how Dillon took some of it (e.g. accessing WestRock's systems after he quit); and alleged that soon after Dillon took the information and quit, WestRock lost business to Dillon" and the competitor for which Dillon left. *Id.*

Because MCC has not adequately alleged that a breach of the confidentiality provision has happened or is inevitable and has also not alleged any injury from a breach, MCC has not stated a claim for breach of contract for the confidentiality provision. *See Burkhart*, 2016 IL App (2d) 151053, ¶ 14. The Court therefore does not reach whether the provision is valid.

### 2. Non-Solicitation

The breach of contract claim similarly fails regarding the non-solicitation provision. The non-solicitation provision prohibits Cuny from "[s]oliciting any employee of FDC to leave FDC or agree to hire any such employee or a former employee of FDC (unless at least six months has passed since termination of such other employee's employment with FDC)" for "twelve (12) months following termination there." [1-11] at 28 ¶ 3(a). But MCC has not alleged that Cuny has yet

11

done this. [30] at 10 ("MCC has not yet specifically identified particular … MCC clients [Cuny] has solicited since going to work for Inovar."). The Court is unaware of any authority supporting a theory of "inevitable solicitation," nor does MCC provide such authority.

Because MCC has not adequately alleged either a breach of the non-solicitation provision or injury from the non-solicitation provision, MCC has not stated a claim for breach of that provision. *Burkhart*, 2016 IL App (2d) 151053, ¶ 14. The Court therefore does not reach whether the provision is valid

### 3. Non-Competition

The non-competition provision provides that Cuny may not "(i) Call upon, solicit, divert, take away, or provide services competitive with the Business ('Competitive Services'), (ii) attempt to solicit, divert, take away, or provide Competitive Services to Employee Contacts, or (iii) accept any business from Employee Contacts for Competitive Services." [1-11] at 28 ¶ 3(a). "The Business" is defined as "producing cut & stack, pressure sensitive, and shrink sleeve labels, as well as, providing certain other products and services to the food and beverage, paint, household products, personal care, and automotive industries." *Id.* at 27. "Employee contacts" is defined as "any customers or potential customers of FDC that Employee called upon, served, made a proposal to provide services to, sold to, or received any information about in preparation for making a proposal to provide services to, during employment by FDC." *Id.* at 28 ¶ 3(a).

Cuny and Inovar argue that this provision is overbroad and therefore unenforceable under Illinois law. [7] at 5–6. The Court agrees. Illinois law disfavors

12

"blanket bars on all activities for competitors." *LKQ Corp. v. Rutledge*, 96 F.4th 977, 982 (7th Cir. 2024). "An employment bar is especially problematic where … it forecloses work within an entire industry or market segment." *Id.* Illinois courts use the "rule of reasonableness test" to determine whether a restraint on trade, like the non-competition provision, is enforceable. *See AssuredPartners, Inc. v. Schmitt*, 2015 IL App (1st) 141863, ¶ 32. "A restraint on trade is reasonable only if it: (1) is no greater than is required to protect a legitimate business interest of the employer; (2) does not impose undue hardship on the employee; and (3) is not injurious to the public. Furthermore, the activity, time, and geographic restrictions must be reasonable." *Id.* (citations omitted). These factors are analyzed "based on the totality of the facts and circumstances of the individual case." *Id.* (citation omitted).

*Arcor, Inc. v. Haas* is instructive. *See* 363 Ill. App. 3d 396 (1st Dist. 2005). The plaintiff-company in *Arcor* sued defendant-employee David Haas, who left to start a rival firm producing a similar product. *Id.* at 398. Per the terms of his employment contract and a shareholder agreement, Haas was prohibited from "being involved in 'any business or venture that sells products competitive to those of Arcor'" for a period of 36 months, with no geographic restriction. *Id.* at 405. The Illinois appellate court reasoned that this restriction went "far beyond trying to prevent Haas from selling center tubes to Arcor's customers" and, in fact "preclude[d] Haas from working, in any capacity, in the industry in which Arcor does business." *Id.* at 405–06. As a result, the Illinois court concluded that "[t]his [was] a blanket prohibition on competition and we cannot enforce such a covenant." *Id.* at 406.

13

The clause at issue here includes similarly broad prohibitions both within the beverage industry and well beyond. Under the Agreement, Cuny may not "provide services competitive with the Business," meaning he cannot engage in the production of "cut & stack, pressure sensitive, and shrink sleeve labels" but also cannot "provid[e] *certain other products and services*," the scope of which is not defined and therefore left boundless. [1-11] at 27, 28 (emphasis added). Moreover, this restriction applies not only to the food and beverage industry, where Cuny entirely focused his efforts while at FDC and MCC, but also to "paint, household products, personal care, and automotive industries." *Id.* at 27. MCC does not explain why such broad prohibitions on activities were or are necessary to its legitimate business interests. Instead, MCC contends that "[w]hatever the scope of the Agreement, there can be no doubt that it was intended to apply and does apply to Cuny's actual conduct." [30] at 6. The Court understands this argument to be MCC's invitation that it blue-pencil the Agreement, which the Court will not do for reasons it explains below.

Unlike the company in *Arcor*, MCC further argues that it "is an international company with international clients" and that as a result "a geographic limitation is unnecessary." [30] at 5. MCC relies on *GemShares LLC v. Lipton*, which concluded that "the lack of a geographic limitation … does not render the non-compete provision [at issue in that case] unenforceable" where the plaintiff had alleged "its business plan involves global financial markets, and any breach of the non-compete clause—no matter where it occurs—therefore risks injury to the company." 17 C 6221, 2019 WL 3287838, at *2 (N.D. Ill. July 21, 2019). But the facts of *GemShares* are quite

14

different than those in the instant case. As the *Gemshares* court explained in an earlier opinion, the defendant, Arthur Lipton, signed an operating agreement that included a non-compete clause when he purchased a share of the plaintiff company. *See GemShares LLC v. Lipton*, 17 C 6221, 2018 WL 827962, at *1 (N.D. Ill. Feb. 11, 2018) ("Lipton bought into GemShares as a one-fifth owner in 2013 … [and] executed an operating agreement that included a term requiring him … to disclose and present to the company opportunities related to or likely to be competitive with GemShares' business."). This is presumably why the opinion MCC relies on takes care to distinguish between restrictive covenants in *employment agreements* and restrictive covenants in "entrepreneurial activities." *Gemshares*, 17 C 6221, 2019 WL 3287838, at *2; *see also id.* ("Illinois law generally disfavors restrictive covenants in employment agreements … [but] Illinois 'is quite willing to enforce covenants executed by entrepreneurs in order to form or sell a business.'") (quoting *Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 634 (7th Cir. 2005)). Put another way, "Illinois may be skeptical about covenants executed by *salesmen* and other employees, but it is quite willing to enforce covenants executed by entrepreneurs in order to form or sell a business." *Hess*, 415 F.3d at 634 (emphasis added). There is no dispute that Cuny falls in the former category, so the Court will apply the same skepticism applied by Illinois courts to restrictive covenants with employees in evaluating the non-compete provision at issue.

MCC also argues "the Agreement allows Cuny to work anywhere he pleases, so long as he does not compete directly with MCC or solicit MCC's customers." [30] at

6. But as already noted, the non-compete provision forbids Cuny from "provid[ing] services competitive with the Business," which includes "producing cut & stack, pressure sensitive, and shrink sleeve labels, *as well as, providing certain other products and services* to the food and beverage, paint, household products, personal care, and automotive industries." [1-11] at 27 (emphasis added). Nothing about this language restricts the clause to products and services which MCC currently provides, rather than also encompassing all products and services it might one day wish to provide, so it is not clear why the language would only restrict Cuny from working with companies that, present-tense, "compete directly with MCC." [30] at 6.

At bottom, MCC does not explain why such a broad and vague restriction is necessary to a legitimate business interest, and Cuny's uncertainty about what work he is allowed to perform, or for who, is a hardship. *See AssuredPartners*, 2015 IL App (1st) 141863, ¶ 32. MCC also makes no effort to argue that the restraint on trade "is not injurious to the public." *Id.* The Court therefore concludes that the non-compete provision is unreasonable and unenforceable. *Id.*

MCC then requests that the Court revise the agreement to be enforceable. [30] at 6–7. MCC is correct that the Court has the power to modify restrictive covenants, but Illinois courts typically refuse to "blue pencil" unenforceable provisions "where the *degree* of unreasonableness renders it unfair." *LKQ Corp. v. Rutledge*, 96 F.4th 977, 983 (7th Cir. 2024) (quoting *Eichmann v. Nat'l Hosp. & Health Care Services, Inc.*, 308 Ill. App. 3d 337, 348 (1st Dist. 1999)); *see also Triumph Packaging Grp. v. Ward*, 834 F. Supp. 2d at 815 (declining to exercise its discretion to "blue pencil" an

16

anti-compete clause that was "significantly overbroad in several ways"); *Eichmann*, 308 Ill. App. 3d at 348 ("Due to the significant deficiencies of the restrictive covenants here, drastic modifications, rather than minor ones, would be necessary and that would be tantamount to fashioning a new agreement."). Because rewriting the non-compete provision to "prohibit Cuny only from working in Inovar's wine and spirits division for 12 months," [30] at 6, would be a "drastic modification[]" of the agreement, the Court declines to do so here. *See also Eichmann*, 308 Ill. App. 3d at 348 ("Modification could have the potential effect of discouraging the narrow and precise draftsmanship which should be reflected in written agreements.") (cleaned up).

At bottom, because the non-compete provision is unenforceable, Cuny cannot be in breach of that provision. *See Burkhart*, 2016 IL App (2d) 151053 ¶ 14 (breach of contract requires "the existence of a valid and enforceable contract"). Counts I and II are therefore dismissed.

### C. Tortious Interference by Inovar and Cuny (Counts III, IV, and V)

Counts III through V of the operative complaint involve claims of tortious interference with contracts and with MCC's business relationships. [1-11] ¶¶ 37–53.[4] But tortious interference with a contractual relation requires, among other elements, that a breach of contract has occurred. *See Bank Fin., FSB v. Brandwein*, 2015 IL App (1st) 143956, ¶ 43 (elements include "defendant intentionally and unjustifiably induced a breach of the contract" and "the wrongful conduct of defendant caused a subsequent breach of the contract by the third party"). Because MCC has not

---

[4] MCC brings Counts III and IV against Inovar; it brings Count V against Inovar and Cuny.

adequately alleged any breach of the contract, it therefore has not adequately alleged tortious interference with that contract.

The claim of tortious interference with business relationships fares no better. According to MCC, "Cuny had relationships with two longtime MCC customers with accounts worth tens of millions of dollars, and [] Inovar hired Cuny for the specific purpose of setting up a business line to sell to customers like these." [30] at 11. That may be true—indeed, for the purpose of the motion to dismiss the Court assumes that it is—but MCC has not alleged that Cuny has so much as talked to a current or prospective MCC client since he has been employed at Inovar. Tortious interference with business relationships requires "some impropriety committed by the defendant," *Romanek v. Connelly*, 324 Ill. App. 3d 393, 406, 753 N.E.2d 1062, 1073 (1st Dist. 2001), and "[c]ompetition is not a tort," *Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 865 (7th Cir. 1999). "[O]n the contrary [it] provides a defense (the 'competitor's privilege') to the tort of improper interference." *Id*. Inovar's intent to at some point in the future compete with MCC by selling labels to similar customers cannot rise to the level of tortious interference.

Counts III through V are therefore dismissed.

### D.    Misappropriation of Trade Secrets (Counts VI though IX)

Counts VI through IX relate to misappropriation of trade secrets under both the Illinois Trade Secrets Act, 75 ILCS 1065 *et seq.*, and the federal Defense of Trade Secrets Act, 18 U.S.C. § 1836. [1-11] ¶¶ 55–97.[5] "The elements of both the federal and

---

[5] MCC brings all four of these claims against both Cuny and Inovar.

state claim are, as relevant here: (1) a trade secret existed; (2) the secret was misappropriated through improper acquisition, disclosure, or use; and (3) the owner of the trade secret was damaged by the misappropriation." *Americana Worldwide Corporation v. Protrade Logistics Corporation*, No. 22 CV 3095, 2025 WL 1836045, at *5 (N.D. Ill. July 3, 2025) (citations omitted).

The Court will assume that the existence of trade secrets has been sufficiently alleged. But, again, MCC does not allege that Cuny has actually disclosed any secrets. Instead, MCC relies on the same inevitable disclosure argument that it used for the breach of contract claim. [30] at 14–15. As discussed above, the facts MCC has alleged do not support the plausible inference that Cuny will inevitably disclose any trade secrets. Both the state and federal claims therefore flounder on the second element. *See Americana*, 2025 WL 1836045, at *5.

Counts VI through IX are therefore dismissed.

## IV. Conclusion

For the foregoing reasons, Cuny and Inovar's motion to dismiss [6] is granted. MCC may refile an amended complaint if it can cure the deficiencies identified above while still complying with its obligations under Federal Rule of Civil Procedure 11. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 519–20 (7th Cir. 2015) ("Unless it is certain from the face of the complaint that any amendment would be futile or otherwise unwarranted, the district court should grant leave to amend after granting a motion to dismiss."). Any amended complaint is due on or before 11/26/25. If MCC does not submit an amended complaint

by 11/26/25 the dismissal will automatically convert to a dismissal with prejudice, and the case will be terminated.

_____
Georgia N. Alexakis
United States District Judge

Date: 11/12/25